**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Paul A. Isaacson, M.D.; William Clewell, M.D.; Hugh Miller, M.D.,<br><br>Plaintiffs,<br><br>vs.<br><br>Tom Horne, Attorney General of Arizona, in his official capacity; William (Bill) Montgomery, County Attorney for Maricopa County, in his official capacity; Barbara LaWall, County Attorney for Pima County, in her official capacity; Arizona Medical Board; and Lisa Wynn, Executive Director of the Arizona Medical Board, in her official capacity,<br><br>Defendants. | No. CV-12-01501-PHX-JAT<br><br>**ORDER** |

Pending before the are: (1) Defendant Montgomery's Motion to Dismiss (Doc. 25), (2) Plaintiffs' Motion for Preliminary Injunction (Doc. 2), and (3) Defendant Montgomery's Motion to Dismiss Defendant LaWall (Doc. 42). The Court held a preliminary injunction hearing on July 25, 2012 and took these matters under advisement. The Court now rules on the Motions.

**I.     FACTUAL AND PROCEDURAL BACKGROUND**

Arizona House Bill 2036 ("H.B. 2036") was approved by Governor Janice K. Brewer on April 12, 2012 and is set to take effect on August 2, 2012. On July 12, 2012, Plaintiffs filed a Complaint in this Court seeking a declaratory judgment that section 7 of H.B. 2036

is unconstitutional. Plaintiffs also request a preliminary and permanent injunction: (1) restraining Defendants, their employees, agents, and successors from enforcing section 7 as to previability abortions and (2) prohibiting Defendants, their employees, agents, and successors from bringing enforcement actions for previability abortions performed while any injunction is in effect restraining enforcement of section 7. Plaintiffs specifically object to the portion of section 7 that provides:

> Except in a Medical Emergency, a person shall not knowingly perform, induce or attempt to perform or induce an abortion on a pregnant woman if the probable gestational age of her unborn child has been determined to be at least twenty weeks.

H.B. 2036, 50th Leg., 2d Reg. Sess. § 7 (Ariz. 2012) (to be codified as Ariz. Rev. Stat. § 36-2159(B)) . "A person who knowingly violates this section commits a class 1 misdemeanor." H.B. 2036, 50th Leg., 2d Reg. Sess. § 7 (Ariz. 2012) (to be codified as Ariz. Rev. Stat. § 36-2159(C)). Further, "[a] physician who knowingly violates this section commits an act of unprofessional conduct and is subject to license suspension or revocation pursuant to title 32, chapter 13 or 17." H.B. 2036, 50th Leg., 2d Reg. Sess. § 7 (Ariz. 2012) (to be codified as Ariz. Rev. Stat. § 36-2159(D)). The statutory scheme also gives standing to certain individuals to bring civil actions for violations of section 36-2159. H.B. 2036, 50th Leg., 2d Reg. Sess. § 7 (Ariz. 2012) (to be codified as Ariz. Rev. Stat. § 36-2159(E)-(H)).

"Abortion" is defined as:

> the use of any means to terminate the clinically diagnosable pregnancy of a woman with knowledge that the termination by those means will cause, with reasonable likelihood, the death of the unborn child. Abortion does not include birth control devices, oral contraceptives used to inhibit or prevent ovulation, conception or implantation of a fertilized ovum in the uterus or the use of any means to save the life or preserve the health of the unborn child, to preserve the life or health of the child after a live birth, to terminate an ectopic pregnancy or to remove a dead fetus.

H.B. 2036, 50th Leg., 2d Reg. Sess. § 3 (Ariz. 2012) (to be codified as Ariz. Rev. Stat. § 36-2151(1)).

"Gestational age" is defined as "the age of the unborn child as calculated from the first day of the last menstrual period of the pregnant woman." H.B. 2036, 50th Leg., 2d Reg.

1   Sess. § 3 (Ariz. 2012) (to be codified as Ariz. Rev. Stat. § 36-2151(4)).

2   "Medical emergency" is defined as "a condition that, on the basis of the physician's good faith clinical judgment, so complicates the medical condition of a pregnant woman as to necessitate the immediate abortion of her pregnancy to avert her death or for which a delay will create serious risk of substantial and irreversible impairment of a major bodily function." H.B. 2036, 50th Leg., 2d Reg. Sess. § 3 (Ariz. 2012) (to be codified as Ariz. Rev. Stat. § 36-2151(6)).

"Viable fetus" is defined as "the unborn offspring of human beings that has reached a stage of fetal development so that, in the judgment of the attending physician on the particular facts of the case, there is a reasonable probability of the fetus' sustained survival outside the uterus, with or without artificial support." Ariz. Rev. Stat. Ann. § 36-2301.01; H.B. 2036, 50th Leg., 2d Reg. Sess. § 1 (Ariz. 2012) (to be codified as Ariz. Rev. Stat. § 36-449.01(7)) ("'Viable fetus' has the same meaning prescribed in section 36-2301.01.").

In section 9 of H.B. 2036, the Arizona Legislature listed a number of findings and purposes it made in promulgating H.B. 2036. Findings in support of section 7 include: (1) that abortion "can cause serious both short-term and long-term physical and psychological complications for women;" (2) that abortion "has a higher medical risk when the procedure is performed later in pregnancy. Compared to an abortion at eight weeks of gestation or earlier, the relative risk increases exponentially at higher gestations;" (3) "[t]he incidence of major complications is highest after twenty weeks of gestation;"(4) "[t]he risk of death associated with abortion increases with the length of pregnancy, from one death for every one million abortions at or before eight weeks gestation to one per 29,000 abortions at sixteen to twenty weeks and one per 11,000 abortions at twenty-one or more weeks . . . After the first trimester, the risk of hemorrhage from an abortion, in particular, is greater, and the resultant complications may require a hysterectomy, other reparative surgery or a blood transfusion;" (5) "[t]here is substantial and well-documented medical evidence that an unborn child by at least twenty weeks of gestation has the capacity to feel pain during an abortion;" and (6) that the State of Arizona has a legitimate concern in protecting the public's health and safety,

- 3 -

1 including the health of women who undergo abortions.  H.B. 2036, 50th Leg., 2d Reg. Sess. § 9(A)(1-7) (Ariz. 2012).

As a result of these findings, the Arizona Legislature stated that it promulgated H.B. 2036 "based on the documented risks to women's health and the strong medical evidence that unborn children feel pain during an abortion at [20 weeks] gestational age."  H.B. 2036, 50th Leg., 2d Reg. Sess. § 9(B)(1) (Ariz. 2012).

## II.   DEFENDANT MONTGOMERY'S MOTION TO DISMISS

Defendant Montgomery ("Defendant") filed a motion to dismiss, arguing that, under *Gonzales v. Carhart*, 550 U.S. 124 (2007), the Court cannot entertain a *facial* attack to H.B. 2036.[1]  (Doc. 25).  In response, Plaintiffs argue that this is not a facial attack because they are only challenging H.B. 2036 "as applied" to previability abortions.  Plaintiffs further argue that, even if this is a facial attack, dismissal would nonetheless be inappropriate.

At the outset, the Court must resolve the debate as to whether this is a facial or as-applied challenge to section 7 of H.B. 2036.  While Plaintiffs attempt to characterize their challenge to section 7 of H.B. 2036 as an "as-applied" challenge, in this action, Plaintiffs are challenging section 7 of H.B. 2036 on its face.  Plaintiffs do not argue that the statute has been applied to Plaintiffs in this action (nor could they because H.B. 2036 has not yet gone into effect), nor do they argue that the *20 week* limitation is constitutional under some unspecified set of facts, but only unconstitutional as-applied to Plaintiffs.

Plaintiffs do argue that the provision of section 7 limiting abortions prior to 20 weeks

---

[1] Defendant Montgomery also appears to argue that the case should be dismissed because the Complaint is not verified.  However, there is no requirement that the Complaint be verified in order for the Court to consider a Motion for Preliminary Injunction.  Rather, Federal Rule of Civil Procedure 65 provides that the court may issue a temporary restraining order without notice to the adverse party or its attorney only if "specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition."  Fed.R.Civ.P. 65(b).  However, this portion of Rule 65 is not implicated in this case because Plaintiffs are seeking a Preliminary Injunction rather than a temporary restraining order, Defendants have notice of Plaintiffs' Motion for Preliminary Injunction, and Plaintiffs submitted proper declarations to the Court in support of their Motion for Preliminary Injunction.

- 4 -

1 is unconstitutional. If the Court were to accept Plaintiffs' argument that it is unconstitutional to limit abortions prior to 20 weeks, there could be no possible reading of section 7 of H.B. 2036 that would render it constitutional "as applied" to certain factual situations. Because any ruling that the statute's 20 week limitation is unconstitutional would render section 7 of H.B. 2036 meaningless (as there is no other limitation in section 7), Plaintiffs are challenging H.B. 2036 on its face, and Plaintiffs' challenge is properly considered a facial challenge.

Defendant Montgomery argues that, because Plaintiffs challenge section 7 of H.B. 2036 on its face, this case should be dismissed because, in *Gonzalez v. Carhart*, 550 U.S. 124 (2007), the United States Supreme Court held that such an attack must be made "as-applied" to a particular factual situation.

In *Gonzales*, Plaintiffs argued that a statute unconstitutionally *lacked* a health exception. 550 U.S. at 167. The Supreme Court found that a facial attack could not be maintained because the respondents in that case had not "demonstrated that the Act would be unconstitutional in a large fraction of relevant cases." *Id.* at 167-168. Rather, the *Gonzales* Court found that an as-applied challenge would be the "proper manner to protect the health of the woman if it [could] be shown that in discrete and well-defined instances a particular condition has or is likely to occur in which the procedure prohibited by the Act must used." *Id.* at 167.

Unlike *Gonzales* in which the challenge was that the statute lacked certain language, H.B. 2036 contains the language to which Plaintiffs object *on its face*. That language is specifically that "a person shall not knowingly perform, induce or attempt to perform or induce an abortion on a pregnant woman if the probable gestational age of her unborn child has been determined to be at least twenty weeks." In their Complaint, Plaintiffs argue that this language is unconstitutional under Supreme Court jurisprudence. As such, in order to decide whether Plaintiffs are correct that, under clearly established law, section 7 of H.B. 2036 is unconstitutional, the Court must decide the merits of Plaintiff's facial challenge to the language of section 7 of H.B. 2036.

Of course, this does not foreclose the possibility that certain as-applied challenges

- 5 -

1 could or must be made under certain circumstances not present here, but, to decide the merits of Plaintiffs' arguments in this case, the Court must determine whether the language of the statute is valid on its face.

Accordingly, Defendant's Motion to Dismiss arguing that the case should be dismissed as an improper facial challenge (Doc. 25) is denied.

### III. PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

#### A. Legal Standard for a Preliminary Injunction

To be entitled to a preliminary injunction, Plaintiffs must show: (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tip in their favor; and (4) an injunction is in the public interest. *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24-25 (2008). Even if Plaintiffs have not demonstrated that they are likely to succeed on the merits, if Plaintiffs establish factors (3) and (4), a preliminary injunction is also appropriate when Plaintiffs have demonstrated "serious questions going to the merits" and the "hardship balance tips sharply toward plaintiff[s]." *Alliance for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (2011).

The Court notes that the parties do not materially dispute the facts in this case. Rather, the primary dispute between the parties is the state of the law following the United States Supreme Court's decision in *Gonzalez v. Carhart*, 550 U.S. 124 (2007).

#### B. Findings of Fact and Conclusions of Law

##### 1. Likelihood of Success on the Merits

Broad facial challenges to an abortion statute "impose a 'heavy burden' upon the parties maintaining the suit." *Gonzales*, 550 U.S. at 167 (citing *Rust v. Sullivan*, 500 U.S. 173, 183 (1991)).

Plaintiffs argue that, if H.B. 2036 goes into effect, it will ban abortions prior to viability. Plaintiffs further argue that, at 20 weeks, no fetus has yet become viable, and thus, by banning abortions beginning at 20 weeks of age, H.B. 2036 bans abortions prior to viability. Plaintiffs argue that "[u]nder HB 2036, a woman seeking to terminate a previability pregnancy at or after 20 weeks due to a medical condition that poses a significant

- 6 -

1   risk to her health may either be prohibited from doing so altogether, or may have to delay the
2   procedure until her condition worsens to the point where it fits within the Act's narrow
3   definition of 'medical emergency' and immediate action is necessary." (Doc. 3 at 3-4).

4   At the outset, the Court notes that in *Planned Parenthood of Southeastern*
5   *Pennsylvania v. Casey*, 505 U.S. 833, 879-80 (1992), the U.S. Supreme Court rejected such
6   a narrow interpretation of the definition of "medical emergency," as set forth in
7   Pennsylvania's abortion statute, which is identical to the definition of "medical emergency"
8   in H.B. 2036. *Compare* H.B. 2036, 50th Leg., 2d Reg. Sess. § 3 (Ariz. 2012) (to be codified
9   as Ariz. Rev. Stat. § 36-2151(6)) (Arizona's definition of "medical emergency") *with Casey*,
10  505 U.S. at 902 (appendix to opinion of O'Connor, Kennedy, and Souter, JJ) (setting forth
11  Pennsylvania's definition of "medical emergency.").

12  The *Casey* Court stated:

> Petitioners argue that the definition is too narrow, contending that it forecloses the possibility of an immediate abortion despite some significant health risks. If the contention were correct, we would be required to invalidate the restrictive operation of the provision, for the essential holding of *Roe* forbids a State to interfere with a woman's choice to undergo an abortion procedure if continuing her pregnancy would constitute a threat to her health. 410 U.S., at 164, 93 S.Ct., at 732. See also *Harris v. McRae,* 448 U.S., at 316, 100 S.Ct., at 2687.
>
> The District Court found that there were three serious conditions which would not be covered by the statute: preeclampsia, inevitable abortion, and premature ruptured membrane. 744 F.Supp., at 1378. Yet, as the Court of Appeals observed, 947 F.2d, at 700–701, it is undisputed that under some circumstances each of these conditions could lead to an illness with substantial and irreversible consequences. While the definition could be interpreted in an unconstitutional manner, the Court of Appeals construed the phrase "serious risk" to include those circumstances. *Id.,* at 701. It stated: "[W]e read the medical emergency exception as intended by the Pennsylvania legislature to assure that compliance with its abortion regulations would not in any way pose a significant threat to the life or health of a woman." *Ibid.* As we said in *Brockett v. Spokane Arcades, Inc.,* 472 U.S. 491, 499–500, 105 S.Ct. 2794, 2799–2800, 86 L.Ed.2d 394 (1985): "Normally, . . . we defer to the construction of a state statute given it by the lower federal courts." Indeed, we have said that we will defer to lower court interpretations of state law unless they amount to "plain" error. *Palmer v. Hoffman,* 318 U.S. 109, 118, 63 S.Ct. 477, 482, 87

- 7 -

> L.Ed. 645 (1943). This "'reflect[s] our belief that district courts and courts of appeals are better schooled in and more able to interpret the laws of their respective States.'" *Frisby v. Schultz,* 487 U.S. 474, 482, 108 S.Ct. 2495, 2501, 101 L.Ed.2d 420 (1988) (citation omitted). We adhere to that course today, and conclude that, as construed by the Court of Appeals, the medical emergency definition imposes no undue burden on a woman's abortion right.

*Id.* at 880. In light of this analysis in *Casey*, the phrase "serious risk" in Arizona's statute must likewise encompass conditions that could lead to "an illness with substantial and irreversible consequences." *See id.*

Ever since *Roe v. Wade*, 410 U.S. 113 (1973), the United States Supreme Court has recognized that the Fourteenth Amendment of the United States Constitution guarantees the "constitutional liberty of the woman to have some freedom to terminate her pregnancy." *Casey*, 505 U.S. at 869. "The woman's liberty is not so unlimited, however, that from the outset the State cannot show its concern for the life of the unborn, and at a later point in fetal development the State's interest in life has sufficient force so that the right of the woman to terminate the pregnancy can be restricted." *Id.*

In *Casey*, the Court stated the broad conclusion that "[b]efore viability, the State's interests are not strong enough to support a prohibition of abortion or the imposition of a substantial obstacle to the woman's effective right to elect the procedure." 505 U.S. at 846. In *Gonzales*, the Supreme Court began defining the types of restrictions the government could impose in light of *Casey*.

More specifically, in *Gonzales*, the Supreme Court *assumed* to be true *Casey*'s premise that "a State 'may not prohibit any woman from making the ultimate decision to terminate her pregnancy'" and then set forth the standards and policy considerations that must be taken into account in determining whether a statute regulating previability abortions is constitutional. *Gonzales*, 550 U.S. at 146 (quoting *Casey*, 505 U.S. at 879). In *Gonzales*, the Court held that a statute prohibiting partial birth abortions both previability and postviability was constitutional. *See id.* at 124.

The parties in this case heavily dispute the effect of the *Gonzales* decision on *Casey*'s

- 8 -

statement that "[b]efore viability, the State's interests are not strong enough to support a prohibition of abortion," and its applicability to H.B. 2036. Having considering H.B. 2036 in detail, the Court finds this statement from *Casey* inapposite because H.B. 2036 does not prohibit all abortions after 20 weeks gestational age. Rather, H.B. 2036 regulates abortions that take place after 20 weeks gestational age.

The portion of H.B. 2036 that defines "abortion" does not purport to include situations where means are used to "save the life or preserve the health of the unborn child, to preserve the life or health of the child after a live birth, to terminate an ectopic pregnancy or to remove a dead fetus." H.B. 2036, 50th Leg., 2d Reg. Sess. § 3 (Ariz. 2012) (to be codified as Ariz. Rev. Stat. § 36-2151(1)). Further, the statute contains a medical emergency exception that allows for an abortion to avert a pregnant woman's death or to avoid a serious risk of substantial and irreversible impairment of a major bodily function. H.B. 2036, 50th Leg., 2d Reg. Sess. § 3 (Ariz. 2012) (to be codified as Ariz. Rev. Stat. § 36-2151(6)). Accordingly, H.B. 2036 does not purport to ban all abortions past 20 weeks gestational age. Further, the statute allows for abortions up to and including 20 weeks gestational age. As such, H.B. 2036 is not a ban on previability abortions, but is rather a limit on some previability abortions between 20 weeks gestational age and viability (which it is undisputed usually occurs between 23 and 24 weeks gestational age).

Accordingly, pursuant to *Gonzales*, H.B. 2036 would be "unconstitutional 'if its purpose or effect is to place a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability,'" 550 U.S. at 156 (quoting *Casey*, 505 U.S. at 878) or, in other words, the issue in this case is whether H.B. 2036 "measured by its text in this facial attack imposes a substantial obstacle to late-term, but previability, abortions." *Id.* Further, where legislation does not impose a substantial obstacle to abortion and the legislation "furthers the legitimate interest" of the Government, abortion legislation will be upheld. *See id.* at 146.

### a. Substantial Obstacle and the State's Interest

Based on the facts of this case, the Court finds that H.B. 2036 does not impose a

1 substantial obstacle to previability abortions. As referenced above, the effect of H.B. 2036
2 limits abortions between 20 weeks and the time of viability.

3 The Court recognizes that viability differs from woman to woman and 23 to 24
4 weeks gestational age is, on average, the attainment of viability. The parties appear to agree
5 that the fetus most commonly attains viability at 23-24 weeks gestational age. *Compare* Doc.
6 2, Exhibit 1 at ¶ 15 ("It is commonly accepted . . . that a normally developing fetus will attain
7 viability at approximately 24 weeks") *with* Doc. 25-1, Exhibit 2 at ¶ 17 ("The number of
8 children that are born and survive at 23-28 weeks gestation is common enough now that the
9 term 'Micro-premie' has been coined to describe them and an additional body of neonatal
10 science is focused upon them. As medical science pushes the frontier of fetal 'viability' to
11 23 weeks and perhaps earlier with the advent of artificial wombs and placental support, there
12 is a possibility that a definition of 'viability' based upon gestational age will soon be
13 irrelevant."). As such, the Court focuses on this 3-4 week time frame (while recognizing that
14 this time frame may be even shorter in the future as technology advances to make viability
15 even earlier) and examines H.B. 2036 from that perspective.

16 Plaintiff Dr. Clewell avows that 90% of abortions take place during the first trimester
17 of pregnancy, through approximately the thirteenth week. (Doc. 2, Exhibit 2 at ¶ 9). Further,
18 Dr. Clewell avows that, in some patients, it is not possible to diagnose a fetal anomaly until
19 close to 20 weeks. (*Id.* at ¶ 13). In support of this statement, Dr. Clewell avows that: (1)
20 amniocentesis, a procedure to detect and diagnose chromosomal anomalies, is usually
21 performed at about 16 weeks and requires 10-12 days for the results to be available; and (2)
22 detailed anatomic ultrasounds are generally done after 18 weeks. (Doc. 2, Exhibit 2 at ¶ 13).
23 Dr. Clewell stops short of claiming that there are any conditions that could only be diagnosed
24 after 20 weeks that could not have been found before that time. And indeed, one of
25 Defendant's experts, Dr. Sawyer avows "[w]ith antenatal screening being done with nuchal
26 fold translucency testing and early genetic marker testing, the diagnosis of fetal anomalies
27 should occur prior to 20 weeks gestation. It is truly rare [that a woman] loses the opportunity
28 to abort because she is past 20 weeks gestation." Doc. 25-3, Exhibit 3 at ¶ 12. Accordingly,

1 the Court finds that it would be extremely rare to find a condition that could be diagnosed
2 after 20 weeks that could not have been diagnosed earlier.

3 Based on the time frames set forth by Dr. Clewell, Plaintiffs argue that a pregnant
4 woman needs time to make the extremely difficult decision as to whether to continue the
5 pregnancy and, in such a situation, it will take longer than twenty weeks to make such a
6 decision. Accepting these statements as true, while H.B. 2036 will make it necessary to
7 make an immediate decision as to whether or not to have an abortion in some cases, such a
8 time limitation cannot be construed to be a substantial obstacle to the right to make the
9 abortion decision itself. *See Gonzales*, 550 U.S. at 157-58 ("the fact that a law which serves
10 a valid purpose, one not designed to strike at the right itself, has the incidental effect of
11 making it more difficult or more expensive to procure an abortion cannot be enough to
12 invalidate it.") (quoting *Roe v. Wade*, 505 U.S. at 874).

13 In upholding a regulation in *Gonzales*, the Supreme Court noted that, despite the fact
14 that the "necessary effect of the regulation" would "be to encourage some women to carry
15 the infant to full term, thus reducing the absolute number of late-term abortions," the
16 regulation was constitutional. See 550 U.S. at 160. Likewise, a corollary proposition in this
17 case is that, while H.B. 2036 may prompt a few women, who are considering abortion as an
18 option, to make the ultimate decision earlier than they might otherwise have made it, H.B.
19 2036 is nonetheless constitutional because it does not "prohibit any woman from making the
20 ultimate decision to terminate her pregnancy." *Id.* at 146 (quoting *Casey*, 505 US. at 879).
21 Therefore, Plaintiffs have not shown that H.B. 2036 imposes a substantial obstacle to
22 previability abortions.

23 Further, to the extent that Plaintiffs argue that, in certain unique circumstances, a
24 diagnosis of fetal anomalies will not occur until after 20 weeks and thus, the woman's
25 decision as to whether to have an abortion will be completely taken away from her, such a
26 situation cannot be the basis of the Court's decision in a facial challenge to a statute. *See*
27 *Gonzales*, 550 U.S. at 153, 167 (noting that "[t]he elementary rule is that every reasonable
28 construction must be resorted to, in order to save a statute from unconstitutionality," and

1  finding that an as-applied challenge is the proper manner to protect a woman if it can be
2  shown that in specific, well-defined instances, a particular procedure must be used.). In this
3  case, if the statute would be unconstitutional as applied to a particular woman because it
4  deprives her of the right to make the abortion choice previability, such a challenge should be
5  entertained at that time.

6  Accordingly, the Court must determine if the State has a legitimate interest in
7  prohibiting abortions past 20 weeks gestational age.  There is no question that the
8  "government may use its voice and its regulatory authority to show its profound respect for
9  the life within the woman." *Gonzales*, 550 U.S. at 157. In this case, the Legislature listed
10 a number of findings it made in promulgating section 7 of H.B. 2036 and the purposes for
11 the legislation. Chief among these purposes were: (1) to prevent abortions where the unborn
12 child would feel the pain involved in an abortion, and (2) to protect the health of the pregnant
13 woman, which resulted in part from a finding that the major complications of abortion are
14 highest after 20 weeks of pregnancy.

15 It is undisputed in the Record before the Court that the two procedures described in
16 *Gonzales* are the non-emergency procedures that would be used to perform an abortion past
17 20 weeks gestational age. The first, a D&E, is described in *Gonzales* as follows:

> Of the remaining abortions that take place each year, most occur in the second trimester. The surgical procedure referred to as 'dilation and evacuation' or 'D & E' is the usual abortion method in this trimester. *Planned Parenthood, supra,* at 960–961. Although individual techniques for performing D & E differ, the general steps are the same.
>
> A doctor must first dilate the cervix at least to the extent needed to insert surgical instruments into the uterus and to maneuver them to evacuate the fetus. *National Abortion Federation, supra,* at 465; App. in No. 05–1382, at 61. The steps taken to cause dilation differ by physician and gestational age of the fetus. See, *e.g., Carhart, supra,* at 852, 856, 859, 862–865, 868, 870, 873–874, 876–877, 880, 883, 886. A doctor often begins the dilation process by inserting osmotic dilators, such as laminaria (sticks of seaweed), into the cervix. The dilators can be used in combination with drugs, such as misoprostol, that increase dilation. The resulting amount of dilation is not uniform, and a doctor does not know in advance how an individual patient will respond. In general the longer dilators

> remain in the cervix, the more it will dilate. Yet the length of time doctors employ osmotic dilators varies. Some may keep dilators in the cervix for two days, while others use dilators for a day or less. *National Abortion Federation, supra,* at 464–465; *Planned Parenthood, supra,* at 961.
>
> After sufficient dilation the surgical operation can commence. The woman is placed under general anesthesia or conscious sedation. <u>The doctor, often guided by ultrasound, inserts grasping forceps through the woman's cervix and into the uterus to grab the fetus. The doctor grips a fetal part with the forceps and pulls it back through the cervix and vagina, continuing to pull even after meeting resistance from the cervix. The friction causes the fetus to tear apart. For example, a leg might be ripped off the fetus as it is pulled through the cervix and out of the woman. The process of evacuating the fetus piece by piece continues until it has been completely removed. A doctor may make 10 to 15 passes with the forceps to evacuate the fetus in its entirety, though sometimes removal is completed with fewer passes.</u> Once the fetus has been evacuated, the placenta and any remaining fetal material are suctioned or scraped out of the uterus. The doctor examines the different parts to ensure the entire fetal body has been removed. See, *e.g., National Abortion Federation, supra,* at 465; *Planned Parenthood,* 320 F.Supp.2d, at 962.
>
> Some doctors, especially later in the second trimester, may kill the fetus a day or two before performing the surgical evacuation. They inject digoxin or potassium chloride into the fetus, the umbilical cord, or the amniotic fluid. Fetal demise may cause contractions and make greater dilation possible. Once dead, moreover, the fetus' body will soften, and its removal will be easier. Other doctors refrain from injecting chemical agents, believing it adds risk with little or no medical benefit. *Carhart, supra,* at 907–912; *National Abortion Federation, supra,* at 474–475.

*Id.* at 135-36 (emphasis added). The second, less-commonly used, procedure is a medical induction, where "[t]he doctor medicates the woman to induce labor, and contractions occur to deliver the fetus." *Id.* at 140. In an induction procedure, the fetus is injected with a medication that induces a heart attack. *See Carhart v. Ashcroft*, 331 F.Supp.2d 805, 875 (D. Neb. 2004) (describing induction by intracardiac injection); *Planned Parenthood Federation of America v.* 320 F.Supp.2d 957, 960 (N.D. 2004) (explaining that induction is also known as a "medical abortion" where "drugs are administered to abort the pregnancy").

In choosing to put a limit on abortions past 20 weeks gestational age, the Arizona Legislature cited to the substantial and well-documented evidence that an unborn child has

- 13 -

the capacity to feel pain during an abortion by at least twenty weeks gestational age. Defendants presented uncontradicted and credible evidence to the Court that supports this determination. Namely, the Court finds that, by 7 weeks gestational age, pain sensors develop in the face of the unborn child and, by 20 weeks, sensory receptors develop all over the child's body and the children have a full complement of pain receptors. Doc. 25-1, Exhibit 1 at ¶ 4; Doc. 25-1, Exhibit 2 at ¶ 20.

That the unborn child can feel pain is further supported by the fact that when provoked by painful stimuli, such as a needle, the child reacts, as measured by increases in the child's stress hormones, heart rate, and blood pressure. Doc. 25-1, Exhibit 1 at ¶ 5. When the child is given anesthesia, these responses decrease, which is why doctors often give both the mother and the fetus anesthesia separately in the case of fetal surgery. *Id.*; Doc. 25-1, Exhibit 2 at ¶¶ 27, 29-30. Nowhere in the Record is it suggested that a fetus is given anesthesia before being subjected to a D&E or an induction abortion.

Given the nature of D&Es and induction abortions, as described above, and the finding that the unborn child has developed pain sensors all over its body by 20 weeks gestational age, this Court concludes that the State has shown a legitimate interest in limiting abortions past 20 weeks gestational age.

Further, in promulgating H.B. 2036, Arizona expressed concerns for the health of the pregnant woman, finding that the instance of complications is highest after twenty weeks of gestation. This additional legitimate interest further supports H.B. 2036's regulation on abortions after 20 weeks gestational age. *See* Doc. 25-3 at Exhibit 3.

Based on the foregoing, the Court finds that Plaintiffs cannot succeed on the merits of their claim that H.B. 2036 is unconstitutional and thus, Plaintiffs' requests for preliminary and permanent injunctions are denied.

### IV.   DECLARATORY JUDGMENT

Because the parties appear to agree that the facts at issue in this case are not materially in dispute, and agree that the Court needs no additional evidence or legal argument to reach its decision in this case, consistent with Federal Rule of Civil Procedure 65(a)(2), the Court

consolidates the preliminary injunction hearing with a trial on the merits.[2]  Based on the analysis set forth above, Plaintiffs are not entitled to a declaratory judgment that section 7 of H.B. 2036 is unconstitutional.

### V.    CONCLUSION

Based on the foregoing findings and conclusions,

**IT IS ORDERED** that Defendants' Motion to Dismiss Case (Doc. 25) is denied.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Preliminary Injunction (Doc. 2) is denied.

**IT IS FURTHER ORDERED** that Plaintiffs' request for a Permanent Injunction is denied.

**IT IS FURTHER ORDERED** that Plaintiffs' request for a declaratory judgment is denied.  The Clerk of the Court shall enter judgment in favor of Defendants and against Plaintiffs on the declaratory judgment action.

**IT IS FURTHER ORDERED** that Defendant Montgomery's Motion to Dismiss Barbara LaWall (Doc. 42) is denied as moot.

DATED this 30th day of July, 2012.

*James A. Teilborg*
United States District Judge

---

[2] While the Court notes that Defendant Montgomery objected to the Court converting the preliminary injunction hearing to a trial on the merits, *see* Doc. 27 at 17, the Court finds that there is no reason that the Court should not proceed to the merits at this time.